Good morning, Your Honors, and may it please the Court. My name is Melissa Hayward. I have the distinct privilege today to be here not just as an advocate on behalf of a client, but also as the client. This case involves a bankruptcy matter where my firm represented multiple entities in an attempt to try to reorganize them. I have devoted my career to being a bankruptcy attorney who attempts to restructure small businesses. I like to joke that bankruptcy is actually one of the most sophisticated practices of law that there actually is. And I think this case tends to support that. Because if Your Honors look to the issues that my firm handled in this case, Your Honors will see we had very extensive litigation matters with respect to the Republic Adversary Proceeding. Lender liability type crimes. Tax disputes regarding business personal property taxes. Real estate issues. Businesses that manufacture metal type products. One of the things I enjoy most about being a bankruptcy practitioner is that I get to learn about all of these different industries. And my firm is a boutique. I started at Lock Lord and as a fourth year associate left Lock Lord to start my law firm as a bankruptcy boutique dedicated to trying to help small struggling businesses. In this case we had three entities that were operating entities and one entity that owned the real estate. All of those entities were jointly administered in this case. The issue here that makes this case different from several other cases that Comerica has Comerica had secured claims against the three operating entities. But it also had a guarantee claim against the real estate entity. And as a result of that guarantee claim against the real estate entity, everything that was done in the case, generally speaking, was done for the global reorganization attempts of an enterprise. And the evidence that was submitted at the hearing on my firm's fee application was uncontroverted in that two hours worth of testimony I went through line by line to some degree explaining how the various tasks that my firm undertook on behalf of this enterprise benefited all of the debtors. Can I ask a question? Yes, Your Honor. Was there an engagement letter at the beginning at the outset here? There was, Your Honor. So my firm's standard practice is always to enter into a written engagement letter. And that's in the record? It's in the record, but it is in the record, yes. And the engagement letter defined the four entities as the client in the engagement letter. Now, the bankruptcy court took issue with the fact that the engagement letter was not submitted as an exhibit as part of my employment application in the case. But I would respectfully represent that that's of no moment here. Now, the court, there was an engagement letter, and the court saw that in advance? No, Your Honor. So the engagement letter came in. It was not filed of record in the case? It was filed of record as part of the proceedings on the fee application, not as part of the original employment. Not going in. Not going in, that's correct. That's unusual. That's correct. Well, typically most, in my experience, engagement letters are not actually attached to employment applications in a bankruptcy case. Bankruptcies are very much mother may I. Everything we do, we go in front of the court, we ask for permission. Speaking of that, could you have submitted when the case was still in Chapter 11, could you have submitted interim fee applications that would have then been, you know, because the operating entities had financing while it was in Chapter 11. The operating entities were factoring their invoices, which means that they were selling their invoices for a discount and obtaining money so that they could then continue to operate. But weren't the banks still giving them some financing during Chapter 11? It was financing, but it's not, it's expensive financing for a struggling business. There was not enough funds in the bankruptcy case to pay my firm at any point in time. Even during, okay. Even while they were in Chapter 11. And so my firm effectively financed this attempted reorganization. And I have done that in many cases, and this one has been the most painful for me, obviously, for obvious reasons. But my firm didn't receive any payment. The problem I have is, I mean, maybe you have a decent argument that the bankruptcy court should have found that your services would have reasonably been expected to benefit even the real estate company. But, you know, it had months and months of hearings, and it was involved in all these rulings, and it's just hard for us to say, given the deference we owe the bankruptcy court and the experience it had living with this case, it's hard for us to say that it abused its discretion in making that finding. Even if, maybe you're right, maybe the bankruptcy court could have gone your way, but that doesn't quite get you where you need to be with us, to reverse. Your Honor, I respectfully disagree. I think that the bankruptcy court did not consider the evidence and rendered a decision that did not. And I'm going to give Your Honors an example. The bankruptcy court allocated no portion of my fees to issues dealing with Bailey, the operating entity's tax dispute with the business personal property taxes. The business, Dallas County had assessed the company's massive equipment within this facility at some, I think it was $7, $8 billion. That tax claim takes priority over Comerica's secured claim. So to the extent that Bailey had to pay that tax claim at this high assessed value, that would have decreased the amount of money available to Comerica because there would have been a secured claim higher than it. So when we went in and litigated with Dallas and received a $4 million decrease in that valuation, every dollar that was saved in having to pay the taxes was then paid to Comerica because this senior secured lien was decreased in value, which inured to Comerica's benefit. By inuring to Comerica's benefit, it therefore inured to Bailey Shelter's benefit because of the guarantee claim that Bailey Shelter had guaranteed the Comerica debt. Now, the bankruptcy court allocated zero fees in dealing with this personal... But the operating companies weren't, my understanding is they weren't paying rent to Shelter during Chapter 11. They were. They were? Well, they were paying, they were paying... They were owing, they owed rent, but I didn't think they were paying it. They were paying the mortgage. So that was, so there was consideration going to offset the, it was rent, but it was really just a pass through to pay the mortgage on Bailey the real estate taxes and all of these other things. So again, these debtors were not inseparable. They were one enterprise. And I don't stand here today saying to this court that every single case, fees should be shared equally and all debtors should be liable. What I am saying is that in this particular case, where what you have is a business where the separate entities fail, that in this instance, the work that my firm did on behalf of trying to reorganize this entire enterprise was likely to benefit each and every debtor. I've had some experience on these lines representing multiple debtors, and we were always very clear that it had all been very carefully marked out as to which debtor we were doing individual work for. Now, did you do that? Your Honor, I, I, might be application goes into different categories. I believe my fee... No, I want to, I have a specific question. Did you keep your time records in a, in a way that you could identify specifically and charge your time to specific debtors? Not per se. So I would allocate my time based on different categories, dealing with, for example, Republic litigation, dealing with stay motions, dealing with the business personal property. And, and the problem is from a practical standpoint as a bankruptcy practitioner, and Your Honors can see, in the year that this matter was in bankruptcy, my firm incurred almost $380,000 in fees, and my rate is, I think in this case, was $375 an hour, and I was the partner on the file. So a lot of work goes into these cases, and a lot of that work, as the Tropicana Court has even recognized in one of the cases cited by Comerica, that it's very difficult to parse out work by debtor and debtor for everything that is done in a sophisticated bankruptcy case like this. For example, when I am going in on joint administration of a case, that is for the benefit of all of the debtors. When I'm going... It did not include any words of severance. So it stated that the debtors, that my firm was representing the debtors, defined as all four, capitalized term, and that throughout the representation, that the debtors, capital D, would be liable for my fees. And, and really... But just to be fair then, you could have been more explicit in making it joint server liability. Sure, Your Honor. We can always learn from our mistakes. But again, this is kind of an import to my bar community, and an issue that has not really been addressed. I've seen a lot of engagement letters, I'm sure we all have in this courtroom, and plenty of them include joint server liability. I'm sure I've signed many of those. Sure, Your Honor. And again, we learn from... I assure Your Honor that most practitioners in my area now will include that language, because we learn from that. But I think... Would the contract be able to get around the bankruptcy code? I mean, isn't it basically still the bankruptcy court's obligation to see which debtor benefited from the services before awarding fees? The contract controls, unless there's a federal interest that says it shouldn't, right? So that's how Section 330 works. We view 330 as a floor. But I mean, bankruptcy courts decide whether the fee is reasonable, whether your hourly rate is reasonable. I mean, it's all within the discretion of the bankruptcy court's equitable powers to see what's a reasonable fee for the work performed, isn't it? That's correct. That's correct. By looking at the evidence... So you can't say, I'm going to get $10,000 an hour, and that binds the bankruptcy court? No. The bankruptcy court has to determine what is reasonable. But here, the bankruptcy... If I understand correctly, you could have not only done the engagement letter, but you could have, I think Judge King alluded to this, you could have submitted it earlier. I certainly could have. I think it's under 328, where you could have gotten the bankruptcy court to look at... 327, yes. Oh, I'm sorry, 327. I'm surprised that you didn't. Right. Your Honor, I would represent to the court that I have never seen an engagement letter attached to an employment application in my 15 years of practice. It's just not something that's commonly done. But at the end of the day, I would like to focus on the public policy argument here, which forget whether or not the engagement letter gave joint and several liability. Forget that issue. Let's look to the issue of what is compensation under 330, which is, was it reasonably likely to benefit the estate? And I submit to this Court that if the answer is yes, then joint and several liability in an underlying engagement letter is irrelevant. The issue is, was the work my firm did reasonably likely to benefit this enterprise? So you don't need any of these engagement letters, and you don't need court approval in advance for your employment, because you can go all the way through the case to the end of the day and come running in and say, so, was it reasonably likely that my firm would benefit the estates, multiple they may have been? To some degree, yes. I would say that to some degree, you don't necessarily need an engagement letter because you're seeking employment by court order. So an engagement letter is typically something that we enter into to say, here's the retainer you're going to pay, here's what we're going to do, here's how we get paid up until the point that we file the case. At that point, then, we are subject to the game of mother may I, where we ask the Court to approve our fees as reasonable. So yes, there is an engagement letter that occurs pre-petition, but for all intents and purposes, we protect the attorney and the law firm pre-petition, and then the engagement letter always specifically says that going forward, fees are subject to approval by the court. But at the end of the day, what we're really looking to is what is reasonable. And in this case, and the Tropicana case, which was, at the time we argued, one of the only cases we could find on point on this very issue, the Tropicana case itself acknowledges that fees can be held liable for fees even when they're not directly involved in those matters. The Tropicana Court specifically acknowledged the enterprise status and how difficult it was to parse out issues when you're representing an enterprise like this. Same thing, for example, with the Energy Partners case. The Energy Partners case, Your Honors, there were 70 affiliates that filed as part of this TXU bankruptcy filing. And even in the court's opinion, talking about how fees get allocated, the court took those 70 subsidiaries and said, okay, we've got three primary ones here. So I want you to allocate your fees amongst these three different primary ones. It's impossible, in most cases, to keep your fees on a debtor-by-debtor case just because of the way and the nature of a bankruptcy practice. Now, that's not to say that in categorizing fees, for example, the Republic litigation, cash collateral, that in categorizing fees by these more narrowed categories that you can say, okay, this inured to the benefit of this debtor in particular. But just because it inures to the benefit of one debtor in particular, and this is also, I think, where the bankruptcy court erred, the bankruptcy court goes through this equal benefit analysis. But that's nowhere in the code. And that's reasonably benefit the restructuring of the enterprise, then those fees should be allocated against all of the debtors. And this is the prime example of a case where, if this has not happened, it's going to stifle firms like mine from undertaking this very sophisticated practice of law in the hopes that we don't become hourly contingency lawyers. With that, I'll yield my time for rebuttal. Thank you. All right. We'll now hear from Comerica. Ms. Chiarello, did I say that right? Good morning, and may it please the Court. Annemarie Chiarello of Winstead, PC, on behalf of Comerica Bank. This is a bankruptcy case where the appellant is seeking to settle Bailey Shelter, a bankrupt debtor, with fees related to work performed for distinct and different legal entities. The appellant seeks to be compensated under a theory that was not disclosed to the bankruptcy court and creditors as required by Rule 2014 of the Bankruptcy Rules and not approved by the bankruptcy court. The appellant's argument seeks to benefit itself to the detriment of the legitimate unsecured creditors of Bailey Shelter's estate. And I think it's important to note that the appellant characterized this as a mistake, a mistake that will injure Bailey Shelter's legitimate unsecured creditors. The bankruptcy court found it to be unreasonable for Bailey Shelter to pay for litigation it wasn't a party to, or otherwise charge Bailey Shelter for work performed for distinct and different legal entities. In fact, the bankruptcy court found, quote, the record clearly reflects that H&A services did not benefit each debtor equally. Today I'd like to touch on four main points. First, I'd like to examine the highly factual inquiry performed by the bankruptcy court and demonstrate that nothing in the record would reflect that the bankruptcy court's ruling was clearly erroneous. Next, I'd like to turn to Section 327 and 330, the applicable disclosure, approval, and compensation statutes. Section 330 recently has been held by the Supreme Court affirming this court's ASARCO decision to be unambiguous. Next, I'd like to turn to this court's Warner decision and the case law supporting the bankruptcy's allocation of fees. Here the factual background is very important. There were four operating debtors in Bailey Shelter. Bailey Shelter was merely a landlord. It had no operations, no employees, and seek to gain very little from the bankruptcy case. I'd like to touch on something that was discussed earlier, the litigation related to personal property taxes. To be clear, Bailey Shelter had no personal property and no personal property taxes. What I understand her to be arguing is that there's an indirect benefit to sheltering because if the operating entities, you know, paid less, owed less taxes, succeeded on some of this litigation against Republic, they would have been financially solvent, which would have meant they paid Comerica, your client, and the real estate company wouldn't be on the hook for this guarantee. So why isn't that something that could have reasonably benefited? If it had succeeded, reasonably benefited the real estate company. That argument was expressly made to the bankruptcy court below and expressly rejected. So to the extent that that has already been presented to the bankruptcy court in its deference, we should defer to the bankruptcy court in its ruling as to whether there was an indirect benefit to the Bailey Shelter estate. Do you agree there can be an indirect benefit? I think on the facts of this case, there was no indirect benefit established by the record. Why not? To start, I think generally speaking, the argument made below was that there was some such that, you know, it was one for all and all for one. The record, for as lengthy as it is, is fairly lacking in specific references to how one thing benefited another or how other than this all for one and all for one or one for all concept, how Bailey Shelter in particular was going to benefit from most of the work performed. I think the Republic business credit litigation is a great example of that. The three operating debtors were the plaintiffs in that litigation. If they had received, if it had been highly successful, there is no requirement that Bailey Shelter would have seen any of that money. In fact, they could have been consumed by operations or what have you. The link was not made that this was necessarily going to benefit Bailey Shelter. Too speculative. Too speculative, exactly. Next, I'd like to turn to the engagement letter, which Judge King, it is found in the record at 6556, and highlight some important points related to that. First, this engagement letter was not to disclose to the bankruptcy court at the outset of the case. Why not? Your Honor, I don't know. I represent the secured creditor. That's your question, too. That's our question, too. I think you had asked earlier if engagement letters are typically attached to employment applications. I know the appellant disagrees with me, but in my experience, that is typically the case. If you look to the boomerang tube case cited in our pleadings, you can see it's a Delaware bankruptcy court dealing with an issue related to engagement letters. Engagement letters, particularly for other professionals, so say a financial advisor or someone like that, it's very important. They often try to put things that maybe would not be necessarily approved by the bankruptcy code. For example, in the boomerang tube case, and there's also a case cited in our pleadings called Moe Shannon, parties, typically not lawyers, but financial advisors, investment advisors, will look at your ruling and put in, obviously, even though ASARCO is applicable to us, you agree, you as state, you creditors, agree to pay our fees in defense of a fee application. Obviously, that's foreclosed by this court and then the Supreme Court's ASARCO decision, even though the contract counterparty and the debtor, whomever, agreed to it, bankruptcy courts routinely strike third-party releases that would otherwise violate this court's precedent and other aspects of engagement letters that, under the bankruptcy code, just can't be approved. Again, the engagement letter was not approved by the bankruptcy court. Third, Comerica filed a reservation of rights early on in this case, alerting parties to this issue, effectively saying, we think Bailey Shelter is different. Their creditor body is different. There really aren't very many unsecured creditors other than us. If this had been disclosed, presumably Comerica would have objected, but we never had the opportunity to object to this so-called joint and separate liability. Next, the engagement letter, whatever it's worth, expressly incorporates the bankruptcy code into its fee compensation arrangement. There's no mention of joint and separate liability. Importantly, courts in Texas have found that, the Texas Supreme Court, in fact, has found that engagement letters are not normal contracts. We submit that there is no room for state law here. The Sixth Circuit has actually supported us in that decision. This is not cited in our plating, so I'll give you a record site. It's at 468F3226, page number 328. In that case, the Sixth Circuit found, with respect to Section 330, there is no room for state law. This is a federal statute that applies. We don't need to look to state law to determine what's reasonable compensation for a 327 or otherwise 330 professional. Next I'd like to turn to Section 330 and 327. As I said, Section 330, which is the applicable statute here, has been ruled unambiguous by this Court and the Supreme Court in connection with this Court's ASARCO decision. Section 330 governs the award of attorney's fees and professional compensation in bankruptcy cases. A party must be a 327 professional or another enumerated professional in order to seek compensation. Section 327 requires court approval for debtors in possession to employ Bankruptcy Counsel. Bankruptcy Rule 2014 requires disclosure and statements. Section 330 clearly grants bankruptcy courts wide discretion not to award fees that are not reasonably likely to benefit the estate. Here, again, we submit that there is no room for state law and Section 330 clearly allows the bankruptcy court to do what it did, which is demonstrate that there is a significant benefit to Bailey Shelter. Next I'd like to turn to this Court's Warner decision. First, the bankruptcy court expressly cited this Court's Warner decision and said it was not prospectively reasonable for Bailey Shelter to apply a large collateral order that it wasn't party to. However, Warner is not the only analysis here, and I think Judge Jolly's concurrence in the Warner opinion certainly supports this. Obviously, the other factors in Section 330 continue to apply. There continues to be a reasonableness analysis. So not only did the bankruptcy court cite the correct law, but it continued to apply the statute, a statute that's unambiguous and grants the bankruptcy court wide discretion. Next I'd like to turn to, I think, the crux of this issue, which is that the appellant is arguing for substantive consolidation of these four jointly administered bankruptcy estates. Substantive consolidation only for its benefit. Substantive consolidation is the bankruptcy concept that combines assets and liabilities of multiple debtors. Here, this case was jointly administered. Administrative consolidation, and this is from this Court's Babcock decision, footnote number six, it states administrative consolidation is merely a procedural device used to deal efficiently with multiple estates. However, substantive consolidation affects the substantive rights of parties and therefore is subject to heightened This is not cited in our briefing, so I'll give you a reporter's cite. It's at 31F3rd 1102 at page 1109. The Eleventh Circuit held that joint administration should not be an indicia in support of substantive consolidation. Substantive consolidation is a highly factual analysis that requires the bankruptcy court to give notice to parties, to give multiple parties the opportunity to object, and importantly requires intense factual determinations that it's in the best interest of the creditors of the estate. Here, the appellant's argument is clearly not in the best interest of the creditors of the estate. It seeks to have joint administration for itself only. I'm sorry, substantive consolidation for itself only. Next, I'd like to turn to the allocation of the fees among the four disparate debtors. I think this sheds some light on Judge King's earlier question, which was essentially why couldn't you have just delineated your time a specific way. In the Energy Future Holdings bankruptcy case, which is cited in our pleading and is widely known to be very complex, millions of dollars in fees, hundreds of lawyers at Kirkland & Ellis. In that case, at the outset of the case, Judge Sanchi entered an interim compensation order. The interim compensation order contemplated parties putting fees into different buckets, effectively. Some for certain debtors, some for others, because at the time the case filed, there were very different When you have different legal entities, presumably you're going to have different issues with them, different orders need to be entered, different things need to be negotiated. For example, here, Bailey Shelter didn't have any cash collateral. It never needed a cash collateral order entered, but for these three somewhat related, I guess under joint ownership at the time, debtors, its bankruptcy case would have been very different. There, so in the Energy Future Holdings case, there was an allocation method approved early in the case. One of the things that Judge Sanchi found important was that it wasn't just the lawyers who were determining what the collective or joint benefit or single benefit was. It was a number of people at Kirkland & Ellis were going back and forth reviewing bills, and then in-house counsel at the debtors was reviewing it. So there was back and forth with counsel saying, you know what, I don't think this is going to benefit this estate. There was an objective process between multiple lawyers, the court, and in-house counsel at Energy Future Holdings. Both the Energy Future Holdings case and then the Eagle Creek case cited in our briefing, both support the proposition that professionals should be paid on a case-by-case basis and not on a consolidated basis. All right, I think we have your argument. Okay, well then, unless there are any further questions, I'd just like to know that we don't believe in an ambiguous statute like has been found here by the Supreme Court that there's any room for public policy, but I'm happy to address any other questions the court has, and if there are no further questions, we would ask Comerica would request this court affirm the Bankruptcy Court and District Courts ruling below. All right, Ms. Hayward, you get the final say. Again, I want to tie this back to were the services reasonably likely to benefit the estate. Cash Collateral allowed the Bailey operating companies to operate in a way that generate and generate revenue. That revenue was utilized to pay down Comerica's claim to the tune of $15,000 a month. That revenue was utilized to pay Bailey Shelter's mortgage to the tune of, I think it was another $10,000 a month. These issues directly benefited Bailey Shelter. I heard Your Honor's question about whether this was an indirect benefit. I would respectfully submit to this court that the evidence presented to the court during two hours of testimony showed that this court, the Bankruptcy Court, misapprehended the effect of the evidence by finding that it was not reasonably likely to benefit Bailey Shelter. By engaging in a sale process of the operating company's surplus equipment through an auction, the work that my firm did on that, by selling that equipment at auction, the money was then used to pay Comerica. By paying Comerica, it reduced Bailey Shelter's contingent guarantee obligation, dollar for dollar. That is a direct benefit, I would respectfully submit. So the issue that the Bankruptcy Court held my firm to a higher standard by saying we didn't explain how every single dollar benefited Bailey Shelter, well, I think if Your Honor's looked to the record and the testimony, we did. Because I stood on the stand, sat on the stand for two hours explaining how everything was related in this instance. So here we provided a material direct benefit, even under pro snacks, to Bailey Shelter. So those fees that were incurred in trying to reorganize this decades-old business were all reasonably likely to benefit Bailey Shelter because by ensuring the survival of the enterprise, we ensured the survival of Bailey Shelter. And the facts, the record in this case is clear. The trustee even had to sell everything as one big enterprise. Because they could not be separated. If Bailey Operating Company died, then Bailey Shelter necessarily died. If Bailey Shelter necessarily died, then the operating company necessarily died. They were inextricably intertwined and they could not be separated. And everything that was done in this case... Then why not seek the substantive consolidation? Well, because substantive consolidation, Your Honor, has to do with all creditors. My firm doesn't need to seek substantive consolidation because we represented all four of the entities. So what this issue comes down to is not the reasonableness of my fees. Nobody has said that, Ms. Hayward, your fees at your firm, you overbilled the file, you overstaffed the file. My fees were reasonable. The court found they were reasonable. The issue here is the allocation of those fees among my separate clients. And I represented four clients. There's no need to substantively consolidate because I already have claims against them. And substantive consolidation allows other creditors of other estates to get to assets that otherwise they would not have recourse to. That's not the issue here. The substantive consolidation argument is respectfully a red herring. Because here, I don't need to substantively consolidation. I have a direct claim. I represented all four of these entities. And so the issue here is not whether the fees were reasonable. It's whether the allocation that the bankruptcy court did in this case was reasonable. But it's more the point, if they're as intertwined as you say, then the creditors should have been able to reach them as one, as you said, one collective entity, essentially. If creditors had sought to do that, then that would have been an issue that could have been litigated in the case. Absolutely. I mean, there's a pretty substantial test for substantive consolidation. And the issue here, though, is not so much that they needed to be substantively consolidated, is that how are my firm's fees for all four clients allocated amongst them? And under state law, it is typically joint and several. And here, even if you don't accept the joint and several liability, which Judge King, I recognize that you were a little bit – you're not as into that argument. But even taking that argument aside, if you just look to was it reasonably likely to benefit, which is the standard under 330. Well, what do you make of the fact that, as I understand it, Bailey Shelter wasn't a party to that suit? To the republic litigation? To the other three, right. That doesn't mean that it didn't benefit Bailey Shelter. And even the Tropicana – It certainly makes it much less direct. Sure. I would argue that that one is much more of an indirect benefit to Bailey Shelter, more so than, for example, the selling, auctioning off equipment, dealing with tax protests, dealing with cash collateral issues with Comerica that actually put money in Comerica's pocket. That would be much more of a direct benefit to Bailey Shelter. And the court didn't – the bankruptcy court didn't even grant my firm those fees. The republic litigation would have ensured the survival of Bailey, the operating entity – that litigation is still ongoing – would have rendered those debtors solvent and allowed them to pay Comerica's debt so that Bailey Shelter would not have had to. Thank you, Your Honors. All right. Thank you. The case is submitted.